# WILLIAM OTTO PAYNE, by JAMES W. COPELAND, His Next Friend, v. JAMES C. DAVIS, Agent, Etc., Appellant.

### In Banc, May 22, 1923.

1. **RAILROAD: Lighting Station Platform: Safe Egress.** It is the duty of a railroad company to properly light its station platform during the arrival and departure of trains for discharging and taking on passengers, and in other respects to exercise proper care to furnish safe egress and ingress to its passengers entering upon the platform.

2. ———: **Carrying Passengers Beyond Station.** It is the duty of railway carriers to stop their trains for the discharge of passengers at and opposite the platform provided for the purpose; and if the passenger is carried beyond the station, and required to alight at an unusual and dark place in the nighttime, he is entitled to be notified where and how to alight, to be warned of any attendant danger, and to be given such assistance or instructions as are reasonably necessary to secure his safe return to the platform, and an opportunity for egress therefrom in the usual way.

3. ———: **Discharging Passenger: Measure of Care.** The duty of a railway carrier to discharge a passenger from its train at his destination in a safe manner and in a safe place is the same high degree of care required of the carrier for the safety of passengers while they are on its cars in transit.

4. ———: ———: ———: **Notice of Conditions.** The carrier is chargeable with notice of the conditions at and immediately adjacent to the spot at which it discharges passengers from its trains, whether that place be immediately in front of its station platform, or two or three hundred feet beyond its station sign and beyond the platform; for wherever the train stops, the calling of the station of the passenger's destination and its coincident stopping are an invitation to him to alight.

5. ———: ———: **Knowledge of Conditions: Contributory Negligence.** West of the station sign, at a distance of 230 feet, on the south side of the tracks, stood a section tool house, thirteen feet long; still further west, 426 feet west of the station sign, which was south of the tracks, was an overhead street-railway bridge; about

800 feet west of the tool house, under the tracks was an unfenced and unlighted sluiceway, eight feet wide and fifteen feet deep; there was no other crossway between the tool house and the sluiceway; north of the gravel platform and immediately north of the station sign was an open space 130 feet wide, but from there on west the right-of-way was fenced; the night was dark and foggy and inclined to rain; neither the station, nor platform, nor any of the surroundings was lighted; plaintiff was riding in the third coach of a west-bound train, and when the station was called and the train stopped he left the car, the brakeman letting down the steps, but giving him no directions or instructions; the place where he left the car was west of the gravel platform and west of the tool house. After the train pulled out plaintiff first walked eastward, saw the tool house, but did not recognize it as such; he turned and walked north, and came to the fence of post and wire along the right-of-way; then he turned back to the track, and saw a light westward on the railway tracks, and found a beaten path along-side the north track near the ties, and in an attempt to extricate himself walked west along that path; he passed under the overhead bridge, and on to the unguarded sluiceway, fell in and was injured. Had the train stopped near the center of the platform, he would have left the car nearly opposite the station sign, and having gone north, as he did, he would have found the open way and safe egress, and he would have found safe egress if the platform had been lighted. He was about seventeen years of age, his home was about a third of a mile north of the station, but he had been in school and steadily employed, and had previously traveled on this railroad only once, and was unacquainted with the station and its surroundings. *Held*, that he cannot be charged with familiar knowledge of the station and its surroundings, and that it cannot be said as a matter of law that he was guilty of such contributory negligence in taking the course he did along the beaten path as bars his right to recover.

6. **EXCESSIVE VERDICT:** $20,000. Plaintiff was seventeen years of age, five feet and two inches high, weighed one hundred and thirty pounds, was in good health and capable; his jaw was fractured in two places, and the teeth loosened; both bones of the right wrist were broken; there was a fracture of the smaller bone of the left wrist, which gives attachment of the bones of the hand to the long bones of the forearm; his right thigh bone was broken in a directly transverse fracture; there was a great loss of blood; he received surgical treatment at the hospital, and splints were applied to the various fractures. At the trial, eight months later, as a result of the fracture of the jaw bone there was a misalignment of the jaws, an impairment of ability to masticate food, and

a restriction of the opening of the mouth, all of which are permanent; the right wrist was crooked, restricted in movement, and incapable of much lifting; the left wrist was not good, its motion, both rotary and extensive, being impaired; the pieces of the thigh bone had failed to unite, although an operation had brought them into apposition; during the day he is compelled to wear a metal brace and bandage, and at night the leg is kept between two bags of sand, strapped to it so he cannot move it in his sleep, and he can sleep on his back only; the leg is about one inch shorter, and the medical testimony was that the injury is permanent, that the leg is merely hanging on, and that union of the bones can be brought about only by another operation, and that even then union would be doubtful. *Held*, that a verdict for twenty thousand dollars was not excessive.

Appeal from St. Louis County Circuit Court.—*Hon. John W. McElhinney*, Judge.

AFFIRMED.

*James F. Green, M. U. Hayden* and *H. H. Larimore* for appellant.

(1) When the defendant deposited the plaintiff in safety on its platform at Edgebrook, it was the duty of the plaintiff to leave the defendant's premises by the usual and customary route, and no liability rests on the defendant because of any injuries plaintiff received while walking up this track and on premises not used as station grounds or station facilities. 5 Elliott on Railroads (3 Ed.) sec. 2493; LeDuc v. Railway, 140 S. W. 758; Deskins v. Railroad, 151 Mo. App. 432; Hutchinson on Carriers, par. 516; Moore on Carriers, 6, 764. (2) The verdict resulted either from partiality or prejudice upon the part of the jury, and because of this situation should not be permitted to stand; and further in view of all of the facts and circumstances, the ends of justice require that the case should be reversed and remanded for a new trial. Jones v. Railway Co., 228 S. W. 780; Goetz v. Ambs, 22 Mo. 172; Whitsett v. Ransom, 79 Mo. 258; Spohn v. Railway Co., 87 Mo. 84; Adams v. Railway Co.,

100 Mo. 569; Gibney v. Transit Co., 204 Mo. 723; Partello v. Railroad, 217 Mo. 661; Harper v. Railroad, 186 Mo. App. 296. (3) The verdict is excessive,₁ Greenwell v. Railroad, 224 S. W. 404; Johnson v. Coal Co , 276 Mo. 57; Lessenden v. Mo. Pac. Ry., 238 Mo. 247; Brady v. Railroad, 206 Mo. 540. (4) When appellant had safely carried respondent from Union Station in St. Louis to Edgebrook, and had stopped the train long enough to enable him to safely alight therefrom and he had safely alighted from the train and had been afforded a reasonable opportunity to leave the premises by any one of the paths which the evidence of respondent establishes existed, appellant's duty as a carrier was fully performed, and he is not liable for damages for such injuries as respondent thereafter sustained as the result of his voluntarily walking along that portion of the company's tracks not forming a part of, or used as, station grounds or station facilities. 5 Elliott on Railroads (3 Ed.) sec. 2411; Van Cleave v. Railroad Co., 107 Mo. App. 96; Hendrick v. Railroad Co., 136 Mo. 548; Deskins v. Railway Co., 151 Mo. App. 432; Fillingham v. Transit Co., 102 Mo. App. 573; Stevens v. Railway Co., 126 Mo. App. 619; Laub v. Railway Co., 118 Mo. App. 488; Talbot v. Railway Co., 72 Mo. App. 291; Waller v. Railway Co., 59 Mo. App. 410; Gunderman v. Railway Co., 58 Mo. App. 370; 2 White's ''Personal Injuries on Railroads'' sec. 557, p. 830. (5) It is not negligence *per se* for a carrier to stop its trains at a point beyond the usual stopping place at a station. Moore on Carriers, sec. 37, p. 670; LeDuc v. Railway Co., 140 S. W. 758; Fillingham v. Transit Co., 102 Mo. App. 573. (6) Appellant was not negligent in failing to inform respondent that, as alleged, he had been carried beyond the station or to warn him of the danger of walking westwardly along that portion of the track between Edgebrook station and Lake Junction. The evidence establishes that respondent was unfamiliar with that territory, but that fact was not in any way communicated by respondent to ap-

pellant's agents and servants in charge of the operation of the train. Before a duty arises on the part of a carrier to warn a passenger of the danger of leaving the carrier's premises by any particular route it must appear that the passenger required warning of such dangers—that is, that he was unaware of their existence. Moore on Carriers, sec. 39, p. 679; Young v. Railway Co., 93 Mo. App. 267; Layne v. Railroad, 175 Mo. App. 34.

*Claude M. Crooks* and *Charles E. Morrow* for respondent.

(1) Defendant was guilty of actionable negligence in carrying plaintiff past his destination and past the station and inviting, causing and permitting him to leave the train when it was dark, at a place with which he was not familiar, in close proximity to many pitfalls and dangers, without notifying him that he had been carried past the station or warning him of the dangers or directing him as to a safe way out. Cossitt v. Railroad, 224 Mo. 97; Winkler v. Railroad, 21 Mo. App. 99; Gott v. Railways Co., 222 S. W. 827; Powell v. Railroad, 229 Mo. 246; McGee v. Railroad, 92 Mo. 208; Warden v. Railroad, 35 Mo. App. 631; Laub v. Railroad, 118 Mo. App. 488; New York Railroad Co. v. Doane, 115 Ind. 435, 1 L. R. A. 157; Wood on Railroad, sec. 305, pp. 1123-1186; 4 R. C. L. sec. 654, p. 1236; Melton v. Birmingham Co., 16 L. R. A. (N. S.) 467; 10 C. J. sec. 160, p. 941. (2) The defendant was guilty of actionable negligence in not having the station of Edgebrook lighted. Sargent v. Railroad, 114 Mo. 348; Gerhart v. Railroad, 110 Mo. App. 105; 10 C. J. sec. 1345, pp. 919-920. (3) Defendant was guilty of actionable negligence in not notifying plaintiff that he had been carried past the station and in failing to warn him of the dangerous place in close proximity to the place where he was invited to leave the train and to which he would likely resort in an effort to extricate himself and in not directing him as to a safe way out. 10 C. J. sec. 1349, pp. 925-926. (4) The verdict is not

excessive. Injuries to head, teeth and jaws: Gingery v. Supply Co., 206 S. W. 400. Injuries to wrists and arms: Lyon v. Railroad, 6 Mo. App. 516. Injuries to leg: Powell v. Railways Co., 226 S. W. 916; Hurst v. Railroad, 280 Mo. 566; Greenwell v. Railroad, 224 S. W. 404.

LINDSAY, C.—The appellant is the Designated Agent under the Federal Transportation Act of 1920, to conduct litigation arising out of the operation of the system of the Missouri Pacific Railroad Company while the property of that company was being operated by the Director General of Railroads. His appeal is here in due form from a judgment rendered by the Circuit Court of St. Louis County in the sum of twenty thousand dollars, in favor of respondent, William Otto Payne, an infant suing by his next friend, and following the verdict of a jury assessing respondent's damages at that sum. The amount sued for was fifty thousand dollars. The injuries complained of were sustained by respondent to his person on the 19th day of February, 1920, through a fall which occurred while he was walking upon the right-of-way and by the side of the tracks of the Missouri Pacific Railroad Company, after having alighted from a Missouri Pacific passenger train upon which he was a passenger, and which had stopped to let off passengers for Edgebrook Station, in St. Louis County. There was no station building at Edgebrook, but only an alighting place made of chat or gravel which extended along the track on either side of the signboard designating the stop "Edgebrook." This signboard is on the south side of the tracks, which run east and west at that point; and the position of the train when it stopped on the night in question, and the distance of the place where respondent alighted, from the signboard and chat alighting place, is a question of importance in this case, as will be more apparent later on. The petition alleges that the plaintiff was carried by and required to alight from the train at a point west of the station, and by reason thereof, not being familiar with

the surroundings in which he found himself, and because of the darkness, and of the failure of the defendant to provide lights or to direct or warn him, he took the way which led him to where he fell and sustained the injuries for which he sues.

Since a determination of the case requires consideration of .the character and relative location of many physical objects at and near the station and the immediate point where the accident occurred, and the other circum-- stances as well under which plaintiff left the train, and also because it is contended here by defendant that failure to light the station grounds is not alleged nor was it alleged that failure to light was a cause of plaintiff going where he did after he left the train, the contents of the petition as to these matters may best be shown by following the language used therein in that regard.

After pleading formal matters, and alleging that Walker D. Hines as Director General of Railroads was in charge and control of the operation of the train and property of the railroad company, and that plaintiff boarded and became a passenger on said train at Union Station in the city of St. Louis, at 6:35 p. m. on the evening in question, and the duty of the Director General, his agents and employees to stop said train at and opposite the station, and at a place reasonably safe for passengers to get out of the train, the petition continues:

"Plaintiff further states that said Edgebrook Station is situated in St. Louis County, Missouri, about 7.57 miles west of Union Station in the city of St. Louis, Missouri, and that about three hundred feet west of the said Edgebrook Station on the south side of the said line or railway there was at said time what is known and called a section or tool house, and that about eight hundred feet westwardly from said section or tool house a road or passageway runs under said railroad tracks across said right of way of about the width of eight feet and of about the depth of fifteen feet, over which the tracks of said railroad were extended by means of a trestle or bridge, which said road or passageway was

then and there uncovered and unguarded, and said trestle or bridge, though floored with ties placed solidly against each other, had no banisters or side hand-rails thereon, and by reason thereof the said trestle or bridge and premises at said point and road and passageway under said tracks were unsafe and dangerous and constituted a dangerous pitfall on the premises so controlled and used and operated by said Walker D. Hines, Director General of Railroads, as aforesaid, and at a place on said right of way and premises into which passengers leaving trains at said Edgebrook Station and Lake Junction Station and the said William Otto Payne leaving said train at the place he left same, were liable to resort to and be and attempt to cross and pass over and were liable to fall and be precipitated into and to be injured, and that said unsafe and dangerous place was so situated that the said William Otto Payne was liable to resort to and be injured thereby if put off and required or permitted to leave said train, as hereinafter stated, in the nighttime and when it was dark, all of which said Walker D. Hines, Director General of Railroads, as aforesaid, and his said predecessor in office and their agents, servants and employees so running and operating said railroad and passenger trains thereon, knew or by the exercise of due care under the circumstances could have known before the time said William Otto Payne was injured, as hereinafter stated.

"Plaintiff further states that said Edgebrook Station so maintained and used and operated by said Walker D. Hines, Director General of Railroads, as aforesaid, and his predecessor in office, was so situated that a passenger being discharged thereat could leave the same and said premises by way of a passageway directly opposite the same and on the north side of said railroad tracks which led to a street and highway in the city of Maplewood, St. Louis County, Missouri, and that westwardly from said Edgebrook Station there was no road, street or passageway or means of ingress or egress to

and from defendant's said tracks and right-of-way leading to a street or highway for a distance of about fifteen hundred feet, where there was a highway northwardly from another station known as Lake Junction Station, situated on said right-of-way and on the north side of said railroad tracks; that on the south side of said railroad tracks from said Edgebrook Station to said Lake Junction Station there was no road, street or highway or passageway leading from said railroad right-of-way and premises.

"Plaintiff further states that said William Otto Payne was carried past said Edgebrook Station by the said Walker D. Hines, Director General of Railroads, as aforesaid, and his agents, servants and employees in charge of and operating said train, and that the train upon which William Otto Payne was then and there riding and being carried as a passenger, as aforesaid, was stopped by the said Walker D. Hines, Director General of Railroads, as aforesaid, and his agents, servants and employees in charge and operating the same at a point on said railroad right-of-way, a distance of about four hundred feet westwardly and past and beyond said Edgebrook Station, and that said station was called and said William Otto Payne was invited and directed by said Walker D. Hines, Director General of Railroads, as aforesaid, and his agents, servants and employees in charge of and operating said train, to leave the same at said point and near said section or tool house and at a point about eleven hundred feet eastwardly from said Lake Junction and at a point about eight hundred feet eastwardly from said road and passageway or bridge and into which passageway the said William Otto Payne was caused to fall and to be injured, as hereinafter stated.

"Plaintiff further states that it was a dark night and that it was then and there dark at said place and there were no lights at or near said Edgebrook Station, nor at the place where said William Otto Payne was so invited and required and directed to leave and got off

the train, nor were there any lights on and along or near said right-of-way between said Edgebrook Station and said Lake Junction Station, and that said William Otto Payne did not then and there know he had been carried past said station, and he was then and there unfamiliar with the surroundings at the place where he was so invited, directed and required to and did leave said train, as aforesaid, and Walker D. Hines, Director General of Railroad, as aforesaid, his agents, servants or employees, in charge of and operating said train, failed to inform him that he had been carried past said station, or of the place he was alighting from said train and failed to inform him of said unsafe and dangerous place on said right-of-way and premises, and failed to warn him of the danger thereof and failed to direct him how to reach a place of safety, and that said William Otto Payne was then and there confused and did not know or realize his exact location, and in order to leave said place and premises and right-of-way and to extricate himself from the situation in which he had so been left by the said Walker D. Hines, Director General of Railroads, as aforesaid, and his agents, servants or employees, in charge and operating said train, and seeing a light in a westwardly direction from the place where he was and westwardly from the place he afterwards was injured, as hereinafter stated, and ascertaining that a pathway led westwardly along said tracks and right-of-way, he walked westwardly on said railroad right-of-way and said premises and over and along said path and traveled way, and by reason of the negligence of said Walker E. Hines, Director General of Railroads, as aforesaid, and his agents, servants or employees, aforesaid, was precipitated into and caused to fall into said road or passageway under said railroad tracks, down to the bottom thereof, a distance of about fifteen feet, at a point where the same crossed said railroad right-of-way and beside said trestle or bridge, whereby the said William Otto Payne was injured, as follows.''

The petition then sets forth at length the injuries received by plaintiff in falling under the circumstances described. The nature of these injuries as disclosed by the testimony will be given and considered later. After describing the injuries alleged to have been sustained by plaintiff, the petition charges generally that the Director General and his agents, servants and employees in charge of the train were guilty of negligence which caused said injuries, and follows this by charging specifically that said negligence consisted in negligently doing or failing to do the following things:

Carrying plaintiff past said Edgebrook Station; stopping said train and inviting, requesting, directing and permitting plaintiff to alight from said train where he did alight; failing to give plaintiff notice that he had passed Edgebrook Station; failing to give plaintiff any notice or direction which way to proceed or go to reach a place of safety; failing to give plaintiff any notice or warning of the proximity of said dangerous crossing over said tracks on said right-of-way, and of said dangerous place; failing to give plaintiff any notice or warning of the danger of walking westwardly along and over said right-of-way, and of said dangerous place; failing to give plaintiff any notice or warning of the danger of walking westwardly along said path and traveled way on said right-of-way; inviting, directing and permitting plaintiff to leave said train at said point about four hundred feet westwardly from said Edgebrook Station and near said uncovered and unguarded passageway across said right-of-way and under said tracks in the nighttime and when it was dark and said place was not reasonably well lighted; failing to light said Edgebrook Station; failing to light said traveled way and path between the place where plaintiff was invited and directed and required to and did leave said train, and to light the said road or passageway under said tracks and said trestle or bridge at the place where plaintiff was injured, and the premises at the place where

plaintiff left and got off of said train and premises at the place where plaintiff was liable to and did resort and pass over and be, in order to reach a place of safety; failing to cover, guard or otherwise protect said road or passageway under said tracks at said place so as to prevent plaintiff and passengers who might and were liable to resort to said place and premises from falling and being precipitated therein; failing to warn plaintiff of the danger of falling into said passageway under said railroad tracks and across said right-of-way; failing to keep and maintain said premises at said place at which plaintiff and other passengers would likely resort, in a reasonably safe condition; and in suffering and permitting said premises at said place to which plaintiff would likely resort to be and remain unsafe and dangerous. And plaintiff's petition then "further states that by reason of the defendant's said negligence the said William Otto Payne was injured as aforesaid."

The answer of defendant, after admitting formal allegations, was a general denial; following which, the defendant answered that the train in question left Union Station at 6:35 p. m. and arrived at Edgebrook Station at 6:55 p. m. on the day mentioned, and on the arrival was stopped at and opposite to the platform provided at said Edgebrook Station for the discharge and reception of passengers; that all passengers on said train, including plaintiff, if he was a passenger on said train, bound for Edgebrook, were discharged by the employees of the Director General operating said train on the station platform at said station of Edgebrook, the same being the usual place for the discharge of passengers from all trains stopping at that station; that said train was not stopped either east or west of said station, but immediately at the same, and that all passengers on said train and the plaintiff, if he was a passenger, intending to alight at such station, were given full and ample opportunity so to do, and to alight upon the platform of said station and depart from said station by a safe route and without danger to themselves.

The defendant further averred that if plaintiff was injured at the time and place as alleged such injuries were the result of his sole negligence, in that plaintiff at the time he was injured "voluntarily, and for his own convenience, was traversing and walking in the nighttime upon the tracks and what is known as the right-of-way of the Missouri Pacific Railroad Company at a point not kept open or maintained for the use of passengers or the public and forming no part of a depot, depot grounds, station or station facilities provided and maintained for the use of those arriving at or departing from the station of Edgebrook or any other station on the line" of the said railroad.

The reply was a general denial.

With issues as to the scene, the circumstances, and the acts of the respective parties thus outlined by the pleadings, the case went to trial on the 20th day of October, 1920. At the close of plaintiff's evidence, and again at the close of the whole case, defendant asked for an instruction that under the pleadings, the law and the evidence plaintiff was not entitled to recover, which the court refused to give. The court gave the three other instructions asked by the defendant, and the substance of these is stated as defining defendant's theory, and for comparison with the evidence.

Instruction 2 told the jury that if the train on arrival at Edgebrook was stopped opposite to and parallel with the chat or earth platform there maintained for the discharge of passengers, and said earth or chat platform was reasonably safe, and defendant discharged plaintiff thereon in safety, the verdict should be for defendant.

Instruction 3 told the jury that if plaintiff was discharged in safety on said platform, and plaintiff thereafter in the nighttime, voluntarily, and for his own convenience, went upon the tracks and right-of-way at a point forming no part of the station or station facilities for the use of those departing from the station, and plaintiff, while on the tracks or right-of-way, fell into

298 Mo.—42

the sluiceway under the tracks, thereby incurring the injuries, the verdict should be for defendant.

Instruction 4 told the jury that notwithstanding the plaintiff might have been at the time unfamiliar with the neighborhood or territory immediately adjacent to or surrounding the station, it was the duty of plaintiff, if he was discharged on the platform at the usual place of discharge of passengers, to leave the premises by the most direct and accessible route, and without going upon the tracks and right-of-way forming no part of the station or station facilities for the use of those departing from said station, and that if plaintiff for the purpose of reaching his destination did go upon that part of the right-of-way forming no part of such facilities, because of not being familiar with the streets and highways adjacent to said station, and fell into the sluiceway under the tracks, thereby incurring his injuries, the verdict should be for the defendant.

For the plaintiff no instructions were given except one, upon the measure of damages, a subject to be dealt with later.

Coming then to the primary matters urged here by defendant as grounds for reversal; and first as to the allegations of negligence. It is contended by counsel for defendant that the "case is not based upon the failure, if any, on the part of defendant to properly light the station grounds at Edgebrook," nor "based upon the proposition that defendant discharged the plaintiff upon the station grounds at Edgebrook and because of the unlighted condition of such grounds, plaintiff, in undertaking to leave the station, wandered into a dangerous place and was injured."

Defendant urges that the negligence set out in the petition is "that defendant carried plaintiff past said Edgebrook Station and discharged him in a dark place and in a place with which he was not familiar" and, it is argued that "whether or not defendant's station grounds at Edgebrook were lighted is not in this case,

and that the question whether or not defendant furnished plaintiff safe and adequate egress from the station is not in the case.'' The defendant thus eliminating, asserts that ''the sole question is whether or not plaintiff was in fact carried past said station grounds and discharged in the darkness at a place with which he was acquainted.''

Upon the allegations contained in the petition it appears that the claim of defendant in this regard cannot be allowed. The petition charges that defendant carried· plaintiff past the station and discharged him at a point about four hundred feet westward from the station grounds, and in the darkness, and that there were no lights on the station grounds, nor along or near the right-of-way between Edgebrook Station and Lake Junction Station. The petition alleges that there was a passageway or means of egress leading from immediately opposite Edgebrook Station and on the north side of the tracks to a street in the city of Maplewood, and that westwardly from said station there was no road, street or highway or means of egress from defendant's tracks and right-of-way leading to a street or highway for a distance of about fifteen hundred feet where there was a highway leading northward from the station known as Lake Junction. The petition alleges that defendant's agents and employees did not inform him that he had been carried past Edgebrook Station, nor of the place where he was alighting, nor direct him how to reach a place of safety, nor warn him of the unsafe and dangerous place on the right-of-way. It charges the defendant with negligence in failing to light the station, to give plaintiff any notice or direction which way to proceed to safety, and to warn him of the danger of walking westwardly along the tracks, right-of-way or traveled way on said right of way. It alleges that plaintiff alighting in the place where he did, with which he was not acquainted, unlighted and in the darkness, was confused, and did not realize exactly where he was, and seeing a light westward toward Lake Junction Station and a

pathway along the tracks leading westward, walked in that direction.

It seems clear from the statements in the petition to which attention has just been directed, and from their relation to each other, and to the allegations as a whole, that the petition cannot be given the restricted meaning claimed for it by defendant's counsel. It must be allowed that the petition sufficiently charges and connects an alleged negligent failure to direct toward the safe and usual egress, to warn of the unsafe way, and to light the station grounds and right-of-way, with the alleged negligent acts of carrying plaintiff past the station, and permitting him to alight in the darkness at a place with which he was unacquainted. Moreover, the defendant does not appear to have objected to the introduction of testimony showing that the station grounds and other places on the right-of-way were unlighted. This unlighted condition was made prominent by plaintiff in the testimony throughout the course of the trial.

There was no controversy upon the trial as to this unlighted condition. A witness for defendant who had charge of the maintenance of defendant's track over the part here involved, testified that the distance from the sign at Edgebrook to the sluiceway into which plaintiff fell was eleven hundred and thirty-five feet, and the distance from this sluiceway to Lake Junction Station was two hundred and sixty-eight feet. The testimony of all witnesses was in accord that there were no lights at Edgebrook, nor at any point on the right-of-way between that point and Lake Junction, except that east of Lake Junction a short distance where there was a switch stand and near this a switch light. The plaintiff passed this switch going westwardly by the north side of the track. The switch light appears to have been located a short distance east of the sluiceway into which he fell. The only other light spoken of as being in the vicinity of Edgebrook Station was a small street light at some distance north and west, not near the station, but

north of defendant's tracks and near the north end of
the overhead bridge of the street railway company under
which ran defendant's tracks.

It is the duty of a railway company to properly
light its station platforms during the arrival and de-
parture of trains, taking on or discharging passengers;
to exercise proper care in other respects to
furnish safe ingress and egress to its pas-
sengers who come upon the platform; (Wal-
ler v. M. K. & T. Ry. Co., 59 Mo. App. 410, 429) and to
so light the platforms of stations that passengers dis-
charged from cars can proceed with safety in the exer-
cise of care along the usual course taken by passengers
to where they would leave the platform. [Gerhart v.
Wabash Railway, 110 Mo. App. 105; Sargent v. St. Louis
& S. F. Railroad Co., 114 Mo. 348.]

*Lighting Platform.*

Following the subject of the condition existing as
to lights, comes the question as to where the train from
which plaintiff alighted was stopped; and whether it
carried him by Edgebrook Station, and if so, how far
beyond. There is some conflict in the testimony on this
important feature of the case, but the facts are not diffi-
cult of ascertainment. The defendant has two tracks
at Edgebrook Station running east and west. West-
bound trains use the north, and east-bound trains the
south track. The train on which plaintiff rode was west-
bound, and plaintiff alighted from the rear or east end
of the third car from the engine. The train was com-
posed of five cars. The cars were described by the con-
ductor as being fifty-five feet long. There was some tes-
timony that the cars were of less length. West from
this station sign "Edgebrook," which was on the south
side of the tracks, at a distance of about two hundred
and sixty feet stood a section tool house, also on the
south side of the tracks and described as being thirteen
feet in length from east to west. West of the tool house,
at a distance from it of about one hundred and fifty feet,
was the long overhead bridge of the street railway, un-

der which defendant's tracks passed. The whole distance from the sign "Edgebrook" to the overhead bridge was said to be four hundred and twenty-six feet by a witness who had measured the distance. The plaintiff testified that when he got off on the north side from the rear end of the third car from the engine, he "must have been twenty-five or thirty feet from the bridge." He says after the train drew past he saw the outline of the tool house. This, he testified later on, was east of where he got off, but he said he did not at the time know the kind of building it was. The two cars of this train next to the engine were dark, and spoken of by witnesses as "dead-head."

Paul Brown, a boy of fourteen, living a short distance from Edgebrook, called by the defendant, testified that on the night in question he rode in the dark or dead-head car of this train next to the engine, and got out at Edgebrook on the south side of the train. On direct examination he said he "got off of it between fifty and seventy-five feet from the street-car bridge." On cross-examination on this subject he testified: "Q. You got off almost under the bridge? A. Yes, pretty close to it. Q. The overhead bridge? A. Yes, sir. Q. Almost under that bridge? A. Yes, sir."

Gerald Rose, seventeen years old, a witness produced by defendant, testified that on the night in question he rode in the dead-head car of the train next to the engine, and got off at Edgebrook. He got off this car, as probably did the other witness mentioned, at the front end next to the tender. He testified as to the position of this car when he got off; on direct examination as follows: "Q. Where was your coach? A. Between the section house and the car bridge." And on cross-examination: "Q. How close do you think you were to the car bridge? A. About twenty-five feet. Q. Twenty-five feet east of the car bridge? A. Yes, sir." This witness got off the south side of the train. He lived about a block and a half west and north from where he got off. He

waited until the train pulled by, and walked west along the track.

The other witnesses who got out of the train, and testified as to its position when it was stopped at Edgebrook on the night in question, were the brakeman and the conductor of the train. They both got off of the train on the north side, or the side away from the station sign and tool house. The brakeman when he got off was at the rear end of the third coach from the engine, and stood between the third and fourth cars. The conductor was between the fourth and fifth cars. The brakeman testified that the train stopped "right about opposite the post;" that about two and one-half cars of the train extended eastward from the station post, and the remainder of the train west of the post. But, he did not see the station house, nor the tool house, nor did he, as he testified, take any notice of either. He could tell nothing as to the position of the engine with reference to the overhead bridge, and said he had not paid attention to these objects. He let down the steps of the third car that night at Edgebrook, but did not remember positively whether anyone had passed out from that car or not. The conductor beyond saying in his testimony that the train stopped at Edgebrook that night, did not undertake to speak more definitely than that, as to where it stopped. He testified that no one got off the train at Edgebrook that night.

The engineer and fireman on the train did not testify..

A train of five cars, each fifty-five feet in length, with engine and tender, would have an entire length of three hundred feet, or a little more. If, as seems probable from this testimony, the front end of the engine of this train was almost flush with the east side of the street car bridge when the train was stopped, then the rear end of the train was approximately one hundred and twenty-five feet west of the station sign at Edgebrook, and, on the same hypothesis, the rear end of the third

car where plaintiff alighted was about two hundred and thirty-five feet west from the station sign. But if he alighted at a point west of the tool house, he would have been nearly three hundred feet west of the station sign.

Manifestly, it is the duty of railway carriers to stop trains for the discharge of passengers at and opposite the platforms provided for the purpose. If the passenger be carried beyond the station, and required to alight at an unusual place and in darkness, he should be notified where and how to alight; be warned of any attendant danger; and be given such assistance or instructions as are reasonably necessary to secure his safe return to the platform, and opportunity for egress therefrom in the usual way. [Cossitt v. St. Louis & Suburban Ry., 224 Mo. 97; Gott v. Kansas City Rys. Co., 222 S. W. 827; Warden v. Mo. Pacific Ry. Co., 35 Mo. App. 631; McGee v. Mo. Pacific Ry. Co., 92 Mo. 208; Winkler v. St. L. I. M. & S. Ry. Co., 21 Mo. App. 99; New York, Chicago & St. Louis Ry. Co. v. Doane, 115 Ind. 435; 4 R. C. L. p. 1249, sec. 661.]

The duty of the carrier to discharge the passenger at his destination in a safe manner and at a safe place, is the same high degree of care required of the carrier for the safety of his passenger while the passenger is in transit. [Fillingham v. St. Louis Transit Co., 102 Mo. App. 573, 582; Rearden v. St. Louis & S. F. Ry. Co., 215 Mo. 105, l. c. 132.] In Gott v. K. C. Rys. Co., 222 S. W. l. c. 830, it was stated:

"The carrier is not absolved from liability, nor from this high degree of care, merely because the passenger is not injured while in the very act of alighting, nor at the very spot or moment where and when he alighted (Cossitt v. Railroad, supra; Atkinson v. Railroad, 90 Mo. App. 489, l. c. 497); and the carrier is, of course—as has been repeatedly held—charged with notice of the conditions at and immediately adjacent to the spot where it discharges passengers from its conveyances. If a passenger is put off at an unsafe place and is injured in consequence, the negligence of the carrier is considered

to be the proximate cause of the injury. [Cossitt v. Railroad, supra.]'' The calling of the station Edgebrook and coincident stopping of the train where it did stop, was an invitation to plaintiff to alight at the place of stopping. [Cossitt v. Railroad, supra.]

There was considerable variance in the testimony describing the chat platform at Edgebrook. Defendant's employee having charge of maintenance of the tracks there testified that this platform was two hundred and ninety feet in length extending from east to west. Other witnesses gave one hundred and fifty feet as its length, and others intermediate estimates. All who testified on that subject agreed in saying that the greater part of the chat or platform construction was on the south side of the tracks where the slope of the ground was toward the south, and much less on the north side of the tracks where the ground opposite the station sign, and for some distance westward immediately next to the track, was comparatively level. All things considered it seems quite clear that the chat platform did not extend to the point where plaintiff alighted from the train.

It is claimed by plaintiff in his petition, and his testimony is in substance, that when he alighted from the train in the darkness, he did not realize where he was, that he was not familiar with the surroundings, and was confused, and therefore took the course he did take. The testimony was that the night was very dark; the weather foggy, and inclined to rain. After the train pulled by him he first walked east a short distance. He saw the building which was the tool house, but saw no light there, and did not recognize it at the time as one whose nature and location he was acquainted with. He turned and walked north. He came to where the right-of-way was enclosed with a fence of posts and wire. The testimony shows that this wire fence extends back eastward along the north line of the right-of-way, to a point almost north of the center of the station of Edgebrook. The open space north of the platform free from any fence begins at a point north of the east end of the platform and extends westwardly about one hundred and thirty feet.

At that point begins the line of fence extending west-wardly along the right-of-way, and which was found by the plaintiff as mentioned above. There was testimony that there were one or more openings in this fence to the west of the station, made by persons in getting through to or from the station. The plaintiff's home was about one-third of a mile northwardly from Edge-brook Station. When he found the wire fence on the north of the right-of-way, he turned back to the tracks. He then saw a light westward. He found there was a beaten path along the side of the north track of the rail-road near the ties, and walked west along that way. Walking thus westward he passed under the overhead street-car bridge, then within a short distance beyond, over the defendant's bridge across the River Des Peres, thence along the track which there was on an embank-ment, and following a path or beaten way near the ties on the north side of the track passed the switch, and walked into the sluiceway or passageway under defend-ant's tracks. This sluiceway was shown to be about eight feet in width and about fifteen feet deep. It was not guarded by a railing, nor was there a handrail along the bridge over it, nor was it lighted.

It is strenuously urged here by counsel for de-fendant that it is unbelievable that plaintiff was not familiar with the surroundings at Edgebrook, and the place where he was injured; that he must have known and did know them; and that his injuries were solely due to his own negligence in going where he did.

At the time of the accident the plaintiff lacked about two months of being seventeen years of age. His father had died some years previously, his mother had re-married, and plaintiff lived with his mother and step-father, and at the time of the accident lived five or six block from Lake Junction Station. He had before that lived in Maplewood and Sullivan, suburban towns near-by, and had attended school until he was in the seventh grade, and thereafter went to work to aid in the support of the family. He worked first about a machine shop in Maplewood, afterwards at a machine shop down town,

then for the Post Dispatch and finally, and up to the time of the accident, for the Curlee Clothing Company, in the city of St. Louis. He testified that in going between home and his place of employment he had always walked to and from Maplewood and gone thence by the street railway, and had gone upon the railroad of defendant upon one occasion only, going then by train from Lake Junction. His testimony was that he worked "pretty steady." Under the evidence in the record it cannot be said that plaintiff was so far acquainted with Edgebrook Station and its surroundings as to be charged with familiar knowledge of it and its surroundings on the night in question. [Rearden v. St. Louis-San Francisco Ry. Co., 215 Mo. 105, 125.]

On the night of the accident plaintiff went to defendant's train at Union Station in St. Louis in company with a foreman under whom he worked for Curlee Clothing Company. At the request of this foreman he had agreed to attend the services at a church in Brentwood, where the foreman lived. In order to reach home in time to do this, and upon the suggestion of the foreman, plaintiff accompanied the foreman, whose name was Taylor, on this train. Upon the train he learned that it did not stop at Lake Junction, but did stop at Edgebrook. Taylor who testified, stated to plaintiff that he could leave the train at Edgebrook, and walk thence to Lake Junction, and Taylor's testimony on cross-examination was also that he suggested plaintiff could walk up the track from Edgebrook, and get to a road running from just east of Lake Junction, north, to the Manchester road. According to Taylor's testimony the plaintiff said nothing in reply to this suggestion. According to Taylor, when Edgebrook was called and the train stopped, plaintiff went out of the rear door of the car, leaving Taylor, who remained and went on to another stop.

There is no controversy here over the instructions given. The primary issue arises upon the peremptory instruction asked by the defendant and refused by the court. That issue was and is to be determined upon the effect given the evidence in view of the duty which the

defendant owed to the plaintiff as that duty has been defined in the cases cited and in like cases. The evidence sufficiently establishes negligence of defendant in failing to light the platform or its surroundings in any way, in carrying plaintiff beyond the platform and inviting him to alight there in the darkness, and then when he did so, in failing to give him any warning or instruction whatever. This being so, there arises out of it the question whether the plaintiff in the course he took, resulting in his injuries, was himself guilty of negligence which as a matter of law precludes his recovering damages from the defendant.

When the train drew by him he was alone and in the darkness. There was no station building, nor light to mark the place where alighting passengers should go. He first walked eastward a short distance. He saw no light in that direction. He saw to the east and south of the tracks the outline of the small tool house, which was unlighted, and which he testified was not a building whose character and relative location was known to him. He walked to the north side of the right-of-way of defendant, and found there a wire fence. He was, he says, confused by his situation. He went back to the track. Looking westward along the track he saw a light. This was the light near Lake Junction Station, distant a little more than one-fourth of a mile on defendant's line. He ascertained that near the ties and on the north side of the tracks, there was a beaten pathway. He walked along this westward toward the light, and in the darkness of the night walked into the sluice or passageway under defendant's tracks, which was not guarded by railing or lighted in any way, and received from the fall therein the injuries for which he sues. In arriving at the answer to the question here presented it is necessary to consider what plaintiff did in the situation actually presented, what a person of ordinary prudence similarly situated would have done, and, it is also proper, by way of test or comparison, to consider what he did before finally taking the course he took, upon an assumption that the platform was actually lighted, or that the train

had been stopped directly opposite the station sign. His first movement was eastward toward the platform, and if the platform had been lighted in any way, this would have been sufficient to apprise him of his situation. But although the platform was unlighted, if the train had been stopped about the center of the platform, and thus discharged him near the center or nearly opposite to the station sign, and he had thence walked a little eastward, and thence northward to the line of defendant's right of way, as he did from the place he was actually discharged, he would have found the way unobstructed and open, because there was an opening there with no fence in the way for a distance of about one hundred and thirty feet, beginning at the east end of the north side of the platform, and extending west to or beyond the center of the platform. Since he took the steps that would have brought him naturally to a safe egress had he been discharged upon the platform as contended by defendant, or, had the platform been lighted for his guidance; and since those steps from where he actually alighted, failed to bring him on the platform, or to an outlet from defendant's premises, but, on the contrary, brought him to a point where he was barred by the wire fence; and since on his return to the tracks, the only light visible was the one westward on the line of defendant's tracks, and a beaten path by the side of the track seemed to lead that way, and he was not familiar with the surroundings nor the particular danger that lay that way, it cannot be said that he was guilty of such negligence in attempting to extricate himself from the situation in which he was placed by the negligence of defendant, as to bar him from recovering damages. The course he took cannot be said to be otherwise than the one he was liable to take under the circumstances, or that others similarly situated might not have taken. Going the way he did, the fall into the sluiceway was, in the darkness, practically certain and inevitable, because there was no cross road or way out between the place where plaintiff alighted and the place of the accident, and

the country on either side of the right-of-way was broken and of fields and woods.

Under the facts in this case the question whether plaintiff's injuries were due to his own negligence was a question proper to be submitted to the jury. It cannot be said that in acting as he did he was guilty of negligence as a matter of law. [Robison v. Floesch Const. Co., 236 S. W. 332; Cooper v. Realty Co., 224 Mo. 709; Root v. K. C. S. Ry. Co., 195 Mo. 348; Ephland v. Mo. Pac. Ry. Co., 137 Mo. 187; Kleiber v. Peoples Ry. Co., 107 Mo. 240; Siegrist v. Arnot, 86 Mo. 200; Adams v. Hannibal & St. Joseph Ry. Co., 74 Mo. 553.]

It is contended that the verdict is the result of partiality or prejudice, and therefore should not be permitted to stand. The case appears to have been well and fairly tried on both sides, and there is nothing shown in the record to justify a reversal and remanding upon the grounds here mentioned.

Lastly it is earnestly insisted that the verdict, if it be allowed to stand at all, is excessive by not less than $10,000, and that the magnitude of the sum awarded is in itself an indication of partiality or prejudice. This calls for a consideration of the extent and nature of the injuries sustained and sued for by plaintiff. At the time of the injury the plaintiff was past seventeen years of age; was five feet two inches in height, weighed one hundred and thirty pounds, was in good health, and was described as being capable in the service in which he was employed. The passage or sluiceway into which he fell was about fifteen feet deep; the bottom of it composed of loose stones. His jaw was fractured on the left side in two places. On of these fractures was near the back corner of the jaw, the other near the front portion. Two teeth on each side of the front fracture were loosened. Both bones of the right wrist were broken; and there was a fracture of a smaller bone of his left wrist, called the scaphoid bone, which gives shape and attachment of the bones of the hand to the long bones of the fore-

arm. His right thigh bone was broken in a transverse fracture, directly across the bone. When found, one end of this bone had perforated the flesh and skin of his leg. He had various bruises about his body, and received great shock from his injuries and loss of blood. He was taken to a hospital where after having recovered sufficiently from the shock, surgical treatment was given him, and splints applied to the various fractures. He remained in the hospital for eight weeks. At the time of the trial, eight months after the injuries were received, the testimony was that as a result of the fracture of the jaw bone there was misalignment of the jaws, an impairment of ability to masticate food, and a restriction of the opening of his mouth. This impairment and restriction were pronounced permanent. At the time of the trial the right wrist was crooked, somewhat restricted in movement, and incapable of much lifting power. The result as to the left hand was not good, leaving an impairment of motion both rotary and extensive in that matter. The pieces of his thigh bone failed to unite, and there was later performed an operation, whereby it was sought to bring the bones into apposition and union, by a steel plate fastened to the bones by screws. The union of the bones of the thigh did not result from the operation, and at the time of the trial they had not united.

At the time he could not use the right leg, was obliged to wear a metal brace and bandage during the day, and at night keep that leg between two bags of sand strapped to it so he would not move it in his sleep, and had to sleep on his back only. The medical testimony was that the injury to the thigh was permanent, that the right leg was about one inch shorter by reason of the injury, that his leg was merely hanging on, and that if union of the parts of fractured bone ever took place, which was said to be doubtful, it could only result from a repetition of the effort made in the former operation. He still had a lump above his forehead where his head was cut open in the fall. Without going further, enough

has been said, based upon the evidence in the record, to show that plaintiff's injuries were numerous and severe, and will hereafter in all probability constitute a serious and permanent impairment of his appearance, health and strength throughout life.

In this view of the matter, a reversal should not be had on account of excessiveness of the verdict, nor the amount thereof reduced, and the judgment should be affirmed. *Small* and *Brown, CC.,* concur.

PER CURIAM:—The foregoing opinion of LINDSAY, C., is hereby adopted as the opinion of Court in Banc. All of the judges concur, except *Woodson, C. J.,* and *Graves, J.,* who concur in all except the amount of judgment. For this they agree to $15,000.